SED, INC., et al., Plaintiffs,

v.

CITY OF DAYTON, Defendant.

No. C–3–81–193.

United States District Court,
S. D. Ohio, W. D.

July 30, 1981.

See also D.C., 515 F.Supp. 737.

William R. McCarty, Martin, McCarty, Richman & Wright, Fairborn, Ohio, for plaintiffs.

Thomas G. Petkewitz, City Atty., City of Dayton, Dayton, Ohio, for defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ISSUE OF FEDERAL PREEMPTION; LOCAL ORDINANCES HELD TO BE NOT INVALID BY VIRTUE OF FEDERAL PREEMPTION; CONFERENCE CALL SET TO DETERMINE FURTHER PROCEEDINGS

RICE, District Judge.

The captioned cause came to be heard upon Plaintiffs' motion seeking an Order of the Court entering partial summary judgment in their favor, and against the Defendant City of Dayton, on Plaintiffs' first claim for relief.

Plaintiffs operate a warehouse within the Dayton city limits in which they store polychlorinated byphenyls (PCBs). The City has recently enacted ordinances which regulate, restrict, or prohibit such storage. In the first claim for relief, Plaintiffs seek a declaratory judgment that the ordinances are unconstitutional and invalid under the supremacy clause of the federal constitution, U.S.Const. Art. VI cl. 2, because the area of PCB storage regulation has been expressly preempted by federal law.

In section 6(a) of the federal Toxic Substances Control Act [TSCA], 15 U.S.C. § 2605(a), the Administrator of the Environmental Protection Agency [EPA] is given broad authority to regulate activities with respect to a chemical substance if he determines that such activities present an unreasonable risk of injury to health or the environment. He may undertake regulation by ordering that any one or more of seven prohibitions or limitations, specified in the statute, shall apply to the hazardous substance in question.

In section 6(e)(1) of TSCA, 15 U.S.C. § 2605(e)(1), the EPA Administrator is directed to promulgate disposal and marking rules specifically governing PCBs. Such rules were promulgated on February 17, 1978. See 43 Fed.Reg. 7150 (1978). The balance of section 6(e) essentially prohibits all manufacture, distribution, and use of PCBs, except in limited circumstances or for limited periods of time, and except as the EPA Administrator shall otherwise provide by rule. The Administrator promulgated "PCB Ban" rules on May 31, 1979. The 1978 PCB disposal and marking rules were reissued, with some modifications, at that time.

Section 18(a)(2)(B) of TSCA, 15 U.S.C. § 2617(a)(2)(B) provides:

§ 2617. Preemption

(a) Effect on State law.

. . . .

(2) Except as provided in subsection (b) of this section—

. . . .

(B) if the Administrator prescribes a rule or order under section 2604 or 2605 of this title (other than a rule imposing a requirement described in subsection (a)(6) of section 2605 of this title) which is applicable to a chemical substance or mixture, and which is designed to protect against a risk of injury to health or the environment associated with such substance or mixture, no State or political subdivision of a State may, after the effective date of such a requirement, establish or continue in effect, any requirement which is applicable to such substance or mixture, or an article containing such substance or mixture, and which is designed to protect against such risk unless such requirement (i) is identical to the requirement prescribed by the Administrator, (ii) is adopted under the authority of the Clean Air Act or any other Federal law, or (iii) prohibits the use of such substance or mixture in such State or political subdivision (other than its use in the manufacture or processing of other substances or mixtures).

"[S]ubsection (b) of this section," at section 2617(a)(2) above, refers to section 18(b) of TSCA, 15 U.S.C. § 2617(b), which allows

the Administrator to exempt a state or political subdivision from the preemptive effect of section 18(a)(2)(B), by rule, upon application of the state or political subdivision.

"[S]ubsection (a)(6) of section 2605 of this title," in the parenthetical at section 2617(a)(2)(B), above, refers to one of the seven requirements which the Administrator may apply to a hazardous chemical substance under section 6(a) of TSCA. The subsection (a)(6) requirement is as follows:

(6)(A) A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacture or processor or by any other person who uses, or disposes of, it for commercial purposes.

(B) A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

In the Decision and Entry of June 11, 1981, as supplemented July 1, 1981, the Court determined that the preemption issue presented by this case might be readily resolved by expedited summary judgment procedures.[1] Specifically, the Court directed the parties to brief the following three questions which, if uniformly answered in the negative, would entitle Plaintiffs to the declaratory judgment they seek:

*First Question* : Is the Toxic Substances Control Act, or the rules promulgated thereunder, unconstitutional or unwarranted?

*Second Question* : Do the ordinances at issue regulate PCBs in such manner that they fall within the internal exemptions to the preemptive effect of section 2617(a)(2)(B)?

*Third Question* : Has the Administrator issued any rule, upon the City's application, exempting it from the preemptive effect of section 2617(a)(2)(B), pursuant to section 2617(b)?

Upon consideration of the affidavits and interrogatories on the record, the Court finds that the *Third Question* must be answered in the negative.

With respect to the *First Question,* the City contends that TSCA's express preemption provision is unconstitutional, at least to the extent it directly infringes upon the authority of local governments to act on matters of health, safety, and land use (which would include the authority, exercised in its ordinances, to restrict the presence of PCBs within the City's geographical boundaries), because these matters traditionally fall within the exclusive province of state and political subdivision regulation. The City relies upon *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), for this proposition.

In *National League of Cities,* the Supreme Court held unconstitutional federal minimum wage statutes applicable to local governmental employees engaged in furnishing traditionally local essential services. The Opinion of the Court, authored by Jus-

---

1. One minor problem arose as a result of the expedited briefing schedule. The Court ordered the City to file a memorandum contra Plaintiffs' summary judgment motion within seven days after receipt of the motion, and allowed Plaintiffs an additional three days to file a reply memorandum. The City has moved to strike Plaintiffs' reply, asserting that the contra memorandum was hand-delivered on June 24, but the reply was not filed until June 30—*four* "working days" later.

This would appear to be incorrect. Although it asserts *in memorandum* accompanying the motion to strike that its contra memorandum

was served on June 24, *the certificate of service attached to the contra memorandum* indicates that it was served by regular mail *on June 25,* which would make the reply memorandum timely. In the event that service was in fact made on June 24, the City has articulated no specific prejudice which might befall it if the reply memorandum, even if filed one day late, should be maintained as a part of the record, herein, and considered by the Court.

The City's motion seeking an Order of the Court striking Plaintiffs' reply memorandum is, therefore, not well taken and is overruled.

tice Rehnquist, grounded the result on no textual constitutional provision, but instead referred to notions of state sovereignty, and the existence of meaningfully functioning state governments, as necessary parts of a constitutional federalism and as inherent limitations on the appropriate exercise of the vast federal commerce clause power. Thus, even though federal regulation of state employee minimum wages is "undoubtedly within the scope of the Commerce Clause," *id.* at 841, 96 S.Ct. at 2469,[2] the exercise of federal regulatory authority over the matter, under the commerce clause, would impermissibly threaten the significance of state governments as viable autonomous entities in the federal structure.

The City says that the same is true of the present case. TSCA's direct regulation of states or, more exactly, direct prohibition against state action in local matters of safety, health and land use—matters traditionally thought to be in the exclusive domain of the states—impermissibly risks survival of the states as meaningful entities in the constitutional federal structure, under the principles established by *National League of Cities.*

If the entirety of the majority opinion in *National League of Cities* were to be considered mandatory authority, rather than, for the most part, *obiter dicta*, the City might well be thought right in seeking invalidation of TSCA's express preemption provision. That opinion certainly does suggest something in the order of a *per se* constitutional rule prohibiting direct federal regulation of state activity (as opposed to exclusive federal regulation of private activity) with respect to traditionally local

matters under the commerce clause. Since safety, health and land use are unquestionably traditionally local matters, and since the TSCA preemption unquestionably restricts state activity in these areas (and not necessarily by permissible regulation of private activity to the exclusion of the states) under authority of the commerce clause, it follows from the majority opinion in *National League of Cities* that the TSCA preemption should be considered unconstitutional.

However, the meaning and pervasive implications of the broad language in the majority opinion, which supports the City's position in this case, need not be considered at length. The Court notes that the *National League of Cities* decision garnered support from only five justices. In his concurring opinion, Justice Blackmun said:

> The Court's opinion and the dissents indicate the importance and significance of this litigation as it bears upon the relationship between the Federal Government and our States. Although I am not untroubled by certain possible implications of the Court's opinion—some of them suggested by the dissents—I do not read the opinion so despairingly as does my Brother Brennan. In my view, the result with respect to the statute under challenge here is necessarily correct. I may misinterpret the Court's opinion, but it seems to me that it adopts a balancing approach, and does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential. With this understanding on my part of the Court's opinion, I join it.

---

**2.** The City's articulation of its position appears to reflect a misunderstanding of this part of *National League of Cities*, and a continuing misunderstanding of the scope of the federal commerce clause power. *See Decision & Entry* of June 11, 1981 at 5–6. The question is not limited to whether the ordinances at issue, alone, actually affect interstate commerce. In determining whether an exercise of commerce clause power is proper—i. e., within the scope of the clause—the inquiry may also focus on the potential affect of the aggregate of local actions, which Congress has determined to reg-

ulate, even though any one of such local actions might not appear to affect commerce in any manner. *Wickard v. Filbrun*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Thus, even if the specific ordinances at issue have a strictly local effect, there is little doubt that the enactment of similar local rules by municipalities throughout the country would have an impact on the continued viability of any *national hazardous waste policy*, the propriety of which, in terms of the scope of the commerce clause, cannot reasonably be challenged.

*Id.* at 856, 96 S.Ct. at 2476. (Blackmun, J., concurring; citation omitted). Although, upon extended reflection, this Court might not necessarily agree that the broader dicta in the majority opinion can be reasonably interpreted to reflect a "balancing test," it must be recognized that Justice Blackmun's concurrence, expressly conditioned on such limited interpretation, was necessary for the result.[3] Thus, Justice Blackmun's limitation of the holding, so as to "not outlaw federal power in areas such as environmental protection," must be considered dispositive of the City's contention.

For this reason, the Court concludes that TSCA's preemption provision is not unconstitutional by virtue of the decision in *National League of Cities.*

The City also contends, with respect to the *First Question,* that the express federal preemption is unconstitutional because:

> ... the TSCA language of [sic] this portion is extremely complex so that persons of ordinary intelligence, including municipal legislators, may have an exceedingly difficult time complying with its provisions [and because] there are no specific standards set forth in 15 U.S.C. 2617(b) to serve as standards or guidelines for the Federal Environmental Protection Agency administrator to follow in determining whether [to grant a local exemption].

In other words, the City says the statute is vague and "unconstitutionally imprecise."

The City articulates no reasoned basis for reaching this conclusion. The City's reference to *Environmental Defense Fund v. E.P.A.,* 636 F.2d 1267 (D.C.Cir.1980) (*EDF*) is inapposite. The parts of the "PCB Ban" rules invalidated in that case[4] were not invalidated because of imprecision or vagueness in the statute or the rules. Indeed, the *EDF* Court specifically upheld the statutorily derived criteria for promulgating rules which the EPA said it had followed. The rules were invalidated simply because the EPA's *rule-making record did not substantially support the rules* under the criteria allegedly employed. The City's reference to certain passages in this Court's prior decision is equally inapposite. The language relied upon refers neither to the statute nor to the rules, but to an excerpt from the preamble accompanying promulgation of the "PCB Ban" rules, which excerpt, in turn, relied upon the preamble accompanying the previously issued disposal regulation. In noting that "the meaning and effect of the [excerpt is] not all that clear," the Court was referring to the fact that it did not *then* have access to the support material which would, presumably, have explained the excerpt within a proper context.

For the forestated reasons, the Court concludes that the *First Question* must be answered in the negative.

With respect to the *Second Question,* the City contends that its ordinances regulate in a manner permitted by two exceptions contained within section 2617(a)(2)(B), to wit: (1) an alleged exception pertaining to local regulations restricting or prohibiting *disposal* of hazardous substances; and (2) the express exception, at section 2617(a)(2)(B)(ii), pertaining to local regulations adopted *under authority of another federal law.*

First, the City says that, to the extent placed in issue in this case, the ordinances only prohibit or restrict intra-city storage of

---

3. Professor Tribe says that the majority opinion in *National League of Cities* is only explicable by (what must be considered) a very sophisticated theory which takes into account not merely the meaningful survival of the states, but also the "affirmative rights" of the citizenry to traditional essential local services. Tribes' theory acknowledges a possible exception for federal regulation of the environment, for example, but would do so under an "urgency" standard, rather than by balancing, which would require intensive scrutiny to ensure that the federal regulation does not directly prohibit state conduct any more intrusively than is necessary to meet the emergency. L. Tribe, *American Constitutional Law* § 5–22 *passim* p. 317 n. 45 (1978). It is interesting to note that other component parts of Tribe's theory appear to have been borne out by later cases. *Id.* at 18 (Supp.1979).

4. The partial invalidity of the TSCA regulations, by virtue of the *EDF* decision, is not pertinent to this case.

PCB's for disposal. *See* Dayton Rev.Code Gen.Ord. § 97.03. According to the City, storage for disposal is disposal.[5]

The City then points out that section 2617(a)(2)(B) is limited by its parenthetical reference to section 2605(a)(6), *supra.* As is evident, section 2605(a)(6) provides authority for the promulgation of federal disposal requirements, but limits such authority in terms of consistency with state and political subdivision requirements. Thus, the City concludes that the local PCB disposal requirements, such as the storage prohibitions and restrictions in the ordinances, are not preempted by section 2617(a)(2)(B).

The City's position is not without support. For example, one authority has said:

> The exception for state regulation concerning the disposal of substances is clear. Regardless of EPA regulatory action under the Act, state or local governments are not preempted from regulating the disposal of chemical substances or mixtures. In addition, there is a type of reverse preemption concerning regulation of disposal. EPA may not take any action to regulate the disposal of a substance or mixture under the Toxic Substances Control Act that is inconsistent with any state or local requirements or requirement under another federal law.

Druley & Ordway, *The Toxic Substances Control Act,* [Monograph Binder] *Envir. Rep.* (BNA) No. 24 at 31 (1977). The Court also notes that SED's own commercial literature adopts this position.

The EPA's announced position on the question is slightly different, but would produce the same result if applied to this case. In the preamble to the 1979 "PCB Ban" rules, the EPA said:

3. State Preemptions

In the Disposal and Marking Rule, EPA stated that State and local requirements regarding disposal of PCBs are exempt from Federal preemption as long as the requirements are not less restrictive than those prescribed by EPA. EPA took this position to avoid interfering with existing PCB disposal requirements in Michigan, Oregon, Indiana, Minnesota and Wisconsin, where the State requirements are at least as stringent as the Federal requirements.

In the past several months, EPA has become concerned that actions by local and State governments to prohibit disposal of PCBs and other substances in their jurisdictions could frustrate the national goal of properly disposing of hazardous chemical substances. While EPA has always believed that States should have the right to set pollution control standards more restrictive than the Federal standards, it would be a matter of national concern if this principle were to become the basis for refusal by States to share in the national responsibility for finding safe means for the proper disposal of hazardous substances. *EPA has decided not to make any changes in its PCB preemption policy at this time.* However, EPA will be considering the preemption issue further in its administration of the Resource Conservation and Recovery Act.

44 Fed.Reg. at 31528 (emphasis added). In the preamble to the 1978 Disposal and Marking Rule, referred to above, the EPA *had* said:

State Exemptions

Officials of the State of Michigan appeared at the legislative hearing and urged that any Federal action leave intact their State program regarding the marking and disposal of PCB's. Oregon,

---

**5.** Although there is some difficulty in squaring this proposition with certain language in the ordinances which appears to differentiate between "disposal" and "storage," the proposition is undoubtedly correct for purposes of applying TSCA. "Disposal" is not defined in the statute. However, the federal regulation which does define "disposal" (and upon which *Plaintiffs* mistakenly rely for a limited view of the

term), is comprehensive and essentially includes any activity after the last use (i. e., "any action that may be related to the ultimate disposition of a PCB," *see* 43 Fed.Reg. 7150, 7150 (1978)). "Disposal" expressly includes "containing . . . or confining" in order to "*terminate the useful life* of PCBs." 40 C.F.R. § 761.2(h) (emphasis added).

Indiana, Minnesota and Wisconsin have also enacted similar State requirements affecting the marking and disposal of PCB's.

EPA has determined that under TSCA, State requirements regarding disposal of PCB's are completely exempt from Federal preemption insofar as they prescribe what may be done within the State boundaries, but that a State may not require PCB's generated within its boundaries to be disposed of in a method less restrictive than prescribed by these regulations. In other words, a State may forbid the burning of PCB articles within its boundaries, but it may not require disposal in a chemical waste landfill where EPA's rules require the articles to be incinerated, outside the State if necessary. (This determination is expanded upon in the Support Document.) However, because State marking requirements are specifically preempted under section 18(a) of TSCA, except when EPA grants an exemption under section 18(b) by rule, EPA has determined that such requirements are preempted by implication for purposes of section 6(e) and these regulations.

43 Fed.Reg. at 7153–54.

The Support Document, referred to in the parenthetical above, explains that, in the EPA's view, the reference to section 2605(a)(6) in section 2617(a)(2)(B) is an absolute limitation on section 2617(a)(2)(B). Essentially, the EPA says that section 2605(a)(6) has priority over section 2617(a)(2)(B) and, as a result, there can be no federal preemption of local disposal requirements. *See* EPA, PCB Marking and Disposal Regulations, Final Action—Support Document 39–42 (circa 1978).

It must be emphasized that the EPA has issued no regulation broadly or specifically exempting any or all local disposal requirements from preemption. The EPA's position is that the statute itself provides the disposal exception through section 2605(a)(6)(B), so that no exemption regulation is necessary. But if this is so, it is difficult to square with the EPA's view that

the statutory disposal exception extends only to "more restrictive" local requirements.

Section 2605(a)(6)(B) does not speak in terms of "more" or "less" restrictive regulations, but in terms of *inconsistent* requirements, i. e., where a federal requirement would command a "violation" of a local regulation. The EPA's own example in the 1978 preamble, as further expanded upon in the Support Document, suggests a situation where "less restrictive" local regulations would be violated by compliance with "more restrictive" federal regulations (i. e., where, in favoring local industry, a state requires that PCBs generated within its boundaries be disposed of in the least expensive manner, but the applicable federal regulation requires the most expensive disposal means). Curiously, the EPA's explanation even suggests that *not all* "more restrictive" local disposal regulations are in fact exempt from preemption (i. e., where the state program requires proximate landfilling and, accordingly, forbids incineration *as well as unnecessary transport for disposal* of hazardous substances on the state's roads, the EPA would apparently take the position that a federal incineration requirement would control, even if it meant transport across the state for incineration in another jurisdiction). These difficulties in application of the EPA's position are indicative of the lack of statutory support. They, alone, explain why the EPA did come to question its position in the 1979 Preamble.

Although the Court is not unmindful of the deference that should be accorded to an administrative agency's interpretation of the statute it is entrusted to administer, the EPA's position, as difficult as it is, and in light of the EPA's recent expression of concern regarding same, is particularly dissatisfying. It also violates the plain meaning of the statute.

The Court must note that it does not agree with Plaintiffs that the parenthetical reference to section 2506(a)(6), in section 2617(a)(2)(B), is wholly inapplicable to this case. It is true, as Plaintiffs contend, that the rules which "trigger" the alleged pre-

emption of local PCB regulation under section 2617(a)(2)(B) are the 1978 and 1979 EPA PCB rules, and that these rules were promulgated under section 2605(e), not section 2605(a). Nonetheless, the section 2605(e) rules do "impos[e] a requirement *described in* subsection (a)(6) of section 2605," i. e., disposal restrictions and prohibitions. The parenthetical in no sense requires that nonpreemptive federal regulations actually be enacted under section 2605(a)(6). (The EPA explains this result in terms of an "implicit incorporation" of section 2605(a)(6)(B) in section 2605(e). *See* Support Document, *supra* at 40–41.)

However, the Court does conclude that the parenthetical reference to section 2605(a)(6), in section 2617(a)(2)(B), is not determinative even though not wholly inapplicable. It must be understood that section 2617(a)(2)(B) contains *three distinct parts.* It first describes the kind of federal administrative action by which preemption is "triggered:"

> ... if the Administrator prescribes a rule or order under section 2604 or 2605 of this title (other than a rule imposing a requirement described in subsection (a)(6) of section 2605 of this title) which is applicable to a chemical substance or mixture, and which is designed to protect against a risk of injury to health or the environment associated with such substance or mixture ...

Section 2617(a)(2)(B) then describes the scope of the preemption which occurs when preemption is "triggered." It defines the scope, not in terms of the kind of federal regulatory action which caused preemption to occur, but simply by reference to the chemical substance which has been federally regulated:

> ... no State or political subdivision of a State may, after the effective date of such requirement, establish or continue in effect, any requirement which is applicable to such substance or mixture, or an article containing such substance or mixture, and which is designed to protect against such risk ...

Finally, section 2617(a)(2)(B) provides three specific exceptions to the broad scope of preemption, when it occurs:

> ... unless such requirement (i) is identical to the requirement prescribed by the Administrator, (ii) is adopted under the authority of the Clean Air Act or any other Federal law, or (iii) prohibits the use of such substance or mixture in such State or political subdivision (other than its use in the manufacture or processing of other substances or mixtures).

The 1978 and 1979 EPA PCB rules do prescribe requirements "described in" section 2605(a)(6). If that were all the EPA's rules accomplished, then, according to the first part of section 2617(a)(2)(B), preemption would not have been "triggered." However, the EPA's rules prescribe numerous section 2605 requirements *"other than* ... a requirement described in subsection (a)(6) of 2605."* It is the "other" federal regulation of PCBs, not merely respecting disposal, which brings about preemption of local PCB regulation.

The preemption which then occurs, according to the second part of section 2617(a)(2)(B), respects *any and all* local regulation of the federal regulated *substance,* i. e., PCBs, regardless of the kind of federal regulation which caused preemption to occur, unless the local regulation can be "pigeonholed" into one of the three specific exceptions provided in the third part of section 2617(a)(2)(B).

Acceptance of the City's position would require that the "carefully crafted" structure of section 2617(a)(2)(B) be ignored. W. Rodgers, *Environmental Law* 907 (1977). If the parenthetical reference to section 2605(a)(6) in the *first part* of section 2617(a)(2)(B) were considered to constitute an exception for local disposal regulation, it would, in effect, carry a limitation on the kind of federal regulatory action *which triggers preemption* over to the second or third part of section 2617(a)(2)(B), and establish it as *a limitation on the scope of preemption,* or as *an exception, thereto,* once preemption has been "triggered." If Congress had intended this

result, it could have easily provided for it by describing the *scope of preemption* in terms of activities as well as of substances, in the second part of section 2617(a)(2)(B),[6] or by providing a *fourth specific exception to pre-emption*, in the third part of section 2617(a)(2)(B).[7] Further, in view of the fact that Congress dealt specifically with disposal in the first part of section 2617(a)(2)(B), it cannot lightly be inferred, as the City essentially suggests, that Congress intended, but casually neglected, to establish disposal as a limitation in the second or third part of section 2617(a)(2)(B).

Nor does this Court's understanding of the effect of federal regulatory action, under section 2617(a)(2)(B), do violence to section 2605(a)(6)(B). The latter section precludes federal *disposal* requirements which would "require any person to take any action which would be in violation of any law or requirement of, or in effect for, a state or political subdivision..." Section 2605(a)(6)(B) thereby implicitly assumes that no local regulation is preempted by federal *disposal* regulations. However, that is also exactly what the Court understands is plainly provided by section 2617(a)(2)(B). Federal *disposal* regulations do *not* preempt any local regulations under the first part of section 2617(a)(2)(B), because of the parenthetical reference to section 2605(a)(6), therein. Thus, there may be occasions where federal disposal regulations, which are alone "non-preemptive," conflict with local requirements, and section 2605(a)(6)(B) establishes the priority of local requirements under such circumstances.

■ However, federal regulations "other than" disposal requirements do preempt local regulations, and they do so (under the second and third parts of section 2617(a)(2)(B)) with respect to "*any* [local]

*requirement* which is *applicable to* [the federally regulated] *substance*," without specific exception for local disposal restrictions or prohibitions. Simply stated, any and all local requirements applicable to the federally regulated substance may not "continue in effect" if the EPA does more than regulate disposal of the substance. If this occurs, as it has, then there is no longer any occasion for federal disposal requirements to command a "violation of any law or requirement of, or in effect for, a state or political subdivision," contrary to section 2605(a)(6)(B), because local requirements applicable to the substance are, thereafter, preempted and invalid.

■ For the forestated reasons, the Court concludes that the ordinances at issue are not excepted from preemption under section 2717(a)(2)(B) because they allegedly constitute local PCB disposal requirements. TSCA does not provide such an exception to preemption.

Second, as an additional basis for excepting its ordinances from preemption under section 2617(a)(2)(B), the City contends that its ordinances are not invalid because they were "adopted under the authority of the Clean Air Act or ... other Federal law ...," as explicitly provided at section 2617(a)(2)(B)(ii). Specifically, the City says that the ordinances were adopted under the authority of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA). Like CWA, the City's contention in this regard is quite complex, but may be loosely paraphrased in the following manner.

The CWA was intended to both promote and protect local action serving to control and abate water pollution. One of the means adopted by Congress to this end is the conditioning of federal financial assistance for local water treatment facilities

---

**6.** E.g., "... no State ... may ... establish ... any requirement prohibiting or regulating manufacturing, processing, or distribution in commerce, which is applicable to such substance ...." *Cf.* 15 U.S.C. § 2605(a).

**7.** E.g., "... or (iv) prohibits the disposal of such substance or mixture in such State or political subdivision."

Indeed, according to the maxim *expressio unius est exclusio alterius*, the fact that Congress specifically excepted three kinds of local regulation from preemption, in the third part of section 2617(a)(2)(B), strongly suggests that a fourth kind—i. e., local disposal regulation—is not so excepted once preemption is triggered.

upon the establishment of local wastewater pretreatment programs. The adequacy of local programs is, in part, measured by the efficacy of local legislation regulating water pollution, including the discharge of toxic pollutants.

In Ohio, oversight of local programs under the CWA has been delegated to the state environmental protection agency (OEPA). According to the Tossey affidavit, submitted by the City, the OEPA ordered the City to develop an adequate pretreatment program prior to the adoption of the ordinances in question. The ordinances were allegedly adopted as "interim" measures, upon consideration of the OEPA mandate, in developing an adequate local pretreatment program.

Essentially, it is the City's position that because the ordinances prohibit or restrict the introduction of PCBs within the City's boundaries, the ordinances necessarily have the effect of restricting the passage of such toxic pollutants through the City's wastewater treatment facilities. Thus, the ordinances at once both serve the general Congressional purpose of increased local measures to prevent water pollution by toxic substances, and also satisfy, in part, the pertinent administrative mandate to which the City is presently subject under the ultimate authority of the CWA. Moreover, the ordinances accomplish these ends in a manner which is not "less stringent" than any existing federal requirement under the CWA, which means are specifically preserved for local governments in section 510 of the CWA, 33 U.S.C. § 1370.

For their part, the Plaintiffs only say that the CWA is inapposite because it deals strictly with the *"discharge"* of pollutants (albeit, including PCBs) into municipal water systems, and has nothing to do with the storage of PCBs in a manner which, as a practical matter, probably precludes their introduction into the local water supply.

■ Plaintiffs miss the point. "Discharge," under the CWA, comprehends *"any addition* of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The CWA is not limited to intentional or foreseen direct additions. It extends, to the indirect, and accidental or unintentional, such as might result by act of God upon an enclosed processing facility, the structure of which would appear to preclude the possibility of the addition of process pollutants to navigable waters. *Cf. United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir. 1979). Thus, even though Plaintiffs' storage of PCBs may not constitute a "discharge," the ordinances' prohibition or restriction of such storage does respect, and necessarily restricts, potential accidental "discharges" under the terms of the CWA.[8]

■ The Court expects that, if accepted, the City's contentions regarding the CWA and the section 2617(a)(2)(B)(ii) exception from preemption in TSCA would provide nothing less than a "gaping hole" in the express preemption otherwise provided by section 2617(a)(2)(B). It is difficult to conceive of *any* local regulation of hazardous substances which would not somehow serve the purpose of water pollution abatement or prevention, and thus could not be termed an exercise of local government power "under authority of" the Clean Water Act. Because a local prohibition or restriction against the introduction of hazardous substances into the geographical limits of a political subdivision does necessarily have the effect of restricting intentional or accidental discharges of such substances within the local government's jurisdiction, the local prohibition or restriction can reasonably be considered authorized under the CWA (even if *not* generally, or specifically, administratively mandated).

■ Nonetheless, the Court finds that such far-reaching exception from preemption was contemplated by Congress in enacting section 2617(a)(2)(B)(ii). The legislative history and other parts of the statute

---

**8.** The Plaintiffs' additional contention that the ordinances were not enacted under the CWA, because they ban PCBs from areas *other than* floodplains, aquifers, lakes, ponds, and the like, is not persuasive for the same reason.

evidence a continuing concern that the EPA's broad authority under TSCA might be unwittingly exercised to disrupt the complex environmental regulatory scheme already existing under a variety of other federal statutes administered by the EPA, as well those administered by other federal agencies whose activities incidentally affect the environment (e. g., the Department of Transportation). For this reason, Congress made it clear that TSCA, although designed as a quite powerful tool, was only to be employed by the EPA as a "last resort," with preference being given to the prior use of environmental controls under existing legislation. *See* section 9 of TSCA, 15 U.S.C. § 2608. *See generally* [1976] U.S. Code Cong. and Ad.News 4491.

■ This case, of course, does not directly involve the "duplication of *Federal action*," which is the subject of section 2608. However, the legislative history indicates that the desire to employ TSCA only as a "last resort," in order to not unduly disrupt the existing environmental regulatory scheme, was carried over (or passed down) to the state level *as the exception to preemption specifically provided by section 2617(a)(2)(B)(ii)*. Deference to, or non-preemption of state regulation which serves the purposes of other existing federal environmental legislation, even if only remotely or incidentally, was similarly and *clearly* intended. As indicated by the House Committee Report, H.R.Rep.No.1341, 94th Cong., 2nd Sess. 54 (1976), the section 2617(a)(2)(B)(ii) exception is not limited to *specific* state regulations which are *specifically* mandated by another federal law, or even to an inordinate exercise of state authority which might find its genesis in some federal law. The exception to preemption extends very broadly to all state regulation which is acknowledged as proper by another federal law:

> Thus, for instance, State emission standards, effluent limitations, or other regulatory requirements adopted under the Clean Air Act or Federal Water Pollution Control Act would not be preempted by rules issued under this bill, even though

the State or local requirement were more stringent. This would be the case if a State limitation, standard, or requirement were adopted, submitted, and approved as part of a State implementation plan required under Federal law. Similarly, the preemption would not apply to a State or local limitation, standard or requirement *if it were adopted under the State or local government's authority which is preserved by a provision of Federal law*, such as a section 116 of the Clean Air Act or sections 1414(e) or 1424(c) of the Public Health Service Act (relating to safe drinking water).

*Id.* (emphasis added).

The reference to section 116 of the Clean Air Act, 42 U.S.C. § 7416, in the preceding excerpt, is particularly pertinent to the present case. That section acknowledges the right of states and political subdivisions to establish local air pollution restrictions not "less stringent" than federal regulations. It does so in language substantially identical to the similar provision in the CWA relied upon by the City, herein. *See* 33 U.S.C. § 1370.

■ The Court concludes that section 2617(a)(2)(B)(ii) is intended to incorporate, by reference, all other federal statutory acknowledgements of the propriety of state regulation, at least in the area of environmental regulation, and to except such acknowledged state regulation from TSCA's express preemption. As one authority has said:

> As a generalization, it can be concluded that if a [hazardous] substance comes within the purview of both the Toxic Substances Control Act and another federal law, *the authority of the state or local government to regulate* the substance to protect against health or environmental risks *is controlled by the other law and not the Toxic Substances Control Act.*

Druley & Ordway, *The Toxic Substances Control Act*, [Monograph Binder] *Envir. Rep.* (BNA) No. 24 at 31 (1977) (emphasis added).

Abatement and prevention of water pollution by toxic substances, including PCBs, fall within the purview of the CWA. The ordinances at issue appear to constitute a proper exercise of local governmental authority in a manner acknowledged and preserved to the states by section 510 of the CWA, 33 U.S.C. § 1370. The ordinances at issue, thus, appear to be excepted from TSCA's express preemption under section 2617(a)(2)(B)(ii).

For the aforestated reasons, the Court cannot conclusively determine that the Second Question must be answered in the negative.[9] Therefore, Plaintiffs' motion, seeking an Order of the Court entering partial summary judgment in their favor, and against the Defendant City of Dayton, on Plaintiffs' first claim for relief (i. e., that the ordinances are invalid for reason of federal preemption) is not well taken and is overruled.

Counsel will take note that a conference call will be had with Court and counsel at 4:30 p. m. on Thursday, August 27, 1981, for the purpose of setting forth further procedures to be followed in the disposition of this case.

9. Indeed, based on the discussion in text, it would appear to follow that the *Second Question* (which is predominantly a question of law) should now be answered in the affirmative. However, the Court declines to do so at this time since such action would, in effect, grant an *unsolicited* partial summary judgment in the City's favor. Moreover, even if the *Second Question* might have been answered in the negative (in the abstract), the record at this juncture, as the City indirectly but correctly points out, is essentially devoid of anything but oblique support for the most basic background facts (e. g., the fact that Plaintiffs are storing PCBs in Dayton), and, therefore, would be wholly inappropriate for the entry of judgment in *either* party's favor. The Court expects that Plaintiffs misunderstood the Court's order, to provide "appropriate submissions addressed to factual questions," as being limited to submission of certified copies of the ordinances in question, and materials directed to the *Third Question*. As a result, the factual development of this case, even for the limited purpose of resolving a rather narrowly confined summary judgment motion, has been especially dissatisfying.